**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ALTON BERRY,

|  |  |
|---|---|
| | CASE NO. 16-10548 |
| *Plaintiff*, | DISTRICT JUDGE GERALD E. ROSEN |
| *v.* | MAGISTRATE JUDGE PATRICIA T. MORRIS |

COMMISSIONER OF SOCIAL SECURITY,

*Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 13, 14)

## I.      RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Berry is not disabled. Accordingly, **IT IS RECOMMENDED** that Berry's Motion for Summary Judgment (Doc. 13) be **DENIED**, that the Commissioner's Motion for Summary Judgment (Doc. 14) be **GRANTED**, and that this case be **AFFIRMED**.

## II.      REPORT

### A.      Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq*., and Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act 42 U.S.C. § 401 *et seq*. (Doc. 3; Tr. 1-4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 13, 14).

Plaintiff Alton Berry was forty-three years old as of February 27, 2015, the date of the ALJ's decision. (Tr. 128, 318). His application for benefits was initially denied on February 3, 2014. (Tr. 237-38). Berry requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Henry Kramzyk on October 1, 2014. (Tr. 133-79). Berry, represented by attorney Larry R. Maitland, II, testified, as did vocational expert ("VE") Jacqueline Shabaucher. (*Id*.). On February 27, 2015, the ALJ issued a written decision in which she found Berry not disabled. (Tr. 107-32). On December 15, 2015, the Appeals Council denied review. (Tr. 1-4). Berry filed for judicial review of that final decision on February 16, 2016. (Doc. 1).

**B.    Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

## C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

3

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and

4

considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least 18 years old and has a disability that began before age 22 (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ found Berry not disabled under the Act. (Tr. 127). The ALJ found at Step One that Berry had not engaged in substantial gainful activity following the alleged onset date, May 22, 2012. (Tr. 113). At Step Two, the ALJ concluded that Berry had the following severe impairments: "degenerative disc disease (DDD) of the cervical spine with cervical radiculopathy, DDD of the lumbar spine, left carpal tunnel syndrome, right wrist neuropathy, obesity, depression, and anxiety." (Tr. 113-14). At Step Three, the ALJ found that Berry's combination of impairments did not meet or equal one of the listed impairments. (Tr. 114-17). The ALJ then found that Berry had the residual functional capacity ("RFC") to perform light work, except with nonexertional limitations as follows:

5

He could sit, stand, and/or walk for 6 hours in an eight hour workday. He could frequently climb ramps and stairs, but he could not climb ladders, rope, or scaffolds. He could occasionally balance, stoop, or crouch, but he could not kneel or crawl. He could frequently operate hand controls with the right dominant upper extremity, and occasionally with the left non-dominant upper extremity. He could not reach overhead with both upper extremities, but could occasionally reach in all other directions with the left non-dominant upper extremity. He could frequently handle and finger with both upper extremities. He could understand, remember and carry out short, simple, repetitive instructions. He could sustain his attention/concentration for 2-hour periods at a time and for 8 hours in the workday on short, simple, repetitive instructions, and he could use judgment in making work decision related to short, simple repetitive instructions. He would require an occupation with set routine and procedures and few changes during the workday. He could not perform fast-paced production work. He could maintain regular attendance and be punctual within customary tolerances and could perform activities within a schedule. He would need to avoid concentrated exposure to vibration. He would need to avoid concentrated exposure to hazards such as unprotected heights and dangerous machinery.

(Tr. 117-26). At Step Four, the ALJ found that Berry could not return to any past relevant work. (Tr. 126). At Step Five, the ALJ concluded that Berry retained the ability to perform work which exists in significant numbers in the national economy. (Tr. 126-27).

### E.    Administrative Record

#### 1.    Medical Evidence

The Court has thoroughly reviewed Berry's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.    Application Reports and Administrative Hearing

##### a.    Berry's Function Report

6

Berry completed a function report on October 27, 2013, in which he asserted that he was unable to sit for more than two hours at a time, could not stand for longer than one hour, could not lift the weights necessary to work as a truck driver, found it difficult to get in and out of vehicles repeatedly. (Tr. 354). He further noted that he suffered from pain of the back, neck, and nerves, that physical therapy was unhelpful, and that "doctors won't do surgery on my neck or pinched nerves because they say it's to [sic] risky." (*Id*.). Berry complained of poor sleep, never getting more than four hours nightly. (*Id*.). He also noted occasionally dropping things due to difficulty with hand nerves. (*Id*.).

Berry noted that his days involve little more than showing, eating, taking pills, laying down, watching television, and returning to sleep. (Tr. 355). Berry reported that his conditions prevented him from working on his own vehicles. (*Id*.). In terms of personal care, he reported difficulty dressing, caring for his hair, and shaving, as the result of hand and arm ailments. (*Id*.). He could not lift more than ten pounds. (Tr. 359). He also noted that he was unable to participate in the care of his girlfriend's daughter because changing the child's diaper or picking her up caused back pain. (Tr. 361).

Berry did not need reminders to complete personal care, but sometimes needed reminders to take medicine. (Tr. 356). He did not cook meals due to difficulty lifting pans, and reported "trouble reading [and] following any type of directions." (*Id*.). He could use a vacuum with his right hand, which took about thirty minutes and left him with back pain, but was unable to move furniture. (*Id*.). He could take out the garbage likewise using only

7

his right hand, but could not remove a garbage bag from its can. (*Id.*). Other housework "require[d] two hands" and caused neck pain. (Tr. 357).

Berry could drive a car and go outside alone. (Tr. 357). However, he could not drive a truck because that activity took "two hands" and because he was unable to "sit for long periods of time." (*Id.*). He shopped in stores about once a month. (*Id.*).

Berry could pay bills and count change, but was unable to handle a bank account or check book because his "brain doesn't comprehend how to use a checkbook and how to spell to keep track of where money goes." (Tr. 357). However, his ability to handle money had not changed as the result of his illnesses. (*Id.*).

Berry's hobbies and interests included hunting and fishing. (Tr. 358). He found it necessary to switch from a traditional bow to a crossbow (Tr. 359), and required someone to load his crossbow (Tr. 358). Berry wrote that he had not attempted fishing since his condition worsened. (*Id.*). In terms of social activities, he enjoyed watching television and chatting with others. (*Id.*). Berry reported some difficulty getting along with others, noting that "sometimes some people are just idiots and piss [people] off." (Tr. 359). Nevertheless, Berry wrote that he hunted with friends who provided him with assistance. (*Id.*).

Berry checked boxes indicating that he experienced limitation in terms of every listed postural and exertional activity, along with limitations to memory, completing tasks, concentrating, understanding, following instructions, using his hands, and getting along with others. (Tr. 359). He could pay attention for "not very long," did not finish what he

started, and "can't read well," thus didn't attempt to read instructions. (*Id*.). In response to "how well do you follow spoken instructions?" and "how well do you get along with authority figures?" Berry wrote "no." (*Id*.). Stress "dr[ove] him nuts," and he did not "like change" in routine. (Tr. 360).

As to assistive devices, Berry wrote that he used a "wrist brace and ankle brace," which were prescribed in 2012. (Tr. 360). Berry wrote that his medications caused side effects including the feeling that he was "not in reality," prevented him from "driv[ing] or function[ing], caused drowsiness, dizziness, and agitation. (Tr. 361).

### b.     Third-Party Function Report

On October 27, 2013, Berry's girlfriend Alissa Galvan filled out a third-party function report which generally corroborated Berry's own function report. (Tr. 338-45). Notably, she seemed to confirm that Berry still hunted with a firearm, though "most guns are to [sic] heavy for him to hold," and asserted that "he has started dropping his gun." (Tr. 342). She also noted that Berry worked as a truck driver for a variety of companies from 1989 through 2008. (Tr. 346).

### c.     Berry's Testimony at the Administrative Hearing

At the October 1, 2014, hearing before the ALJ, Berry testified that he lived with his girlfriend and her children. (Tr. 139). He exhibited some difficulty following directions,

naming the other members of his household after the ALJ asserted that their names were not relevant or necessary. (*Id*.).

Berry asserted that his height was five foot seven, and that he "shrunk three" inches from his prior measurement of five foot ten inches. (Tr. 141). He was unable to "read the book" necessary to obtain his General Educational Development degree. (Tr. 142). He was unable to read and write "100 percent," and had a hard time reading or writing simple messages. (*Id*.). He later described being unable to read even children's books. (Tr. 166).

Berry noted that he became unable to work in 2008 due to back and neck pain. (Tr. 144). He asked to stand during the hearing, evidently to relieve back or neck pain. (Tr. 149). More specifically, Berry asserted that several of his vertebrae were "out of place," which resulted in a pinched nerve, causing arm and leg issues. (Tr. 155). He also complained of arthritis of the hands and legs; nerve pain in the arms, neck, back, and legs; and swelling in the discs of his back. (Tr. 155). He underwent surgery of his left shoulder, and was instructed to lift no more than ten pounds. (Tr. 156). Berry further alleged that he would have difficulty carrying weights over eight pounds. (Tr. 160). He could use a weed whacker, but his limited lifting ability required him to purchase a lighter one. (*Id*.). He could walk two blocks without stopping, could stand for about thirty minutes, and could sit for about fifteen to twenty minutes. (*Id*.). Berry noted that it took him approximately forty minutes to make it to the hearing. (Tr. 164). He could bend at the waist, but doing so would cause his back to "lock up." He could not squat. (*Id*.). Berry reported problems with

using his hands, in that he would sometimes drop objects, and would other times crush them, preventing him from drinking cans of pop. (Tr. 161). Berry asserted that he was unable to tell the difference between hot and cold with his hands. (Tr. 165). He sometimes vacuumed, but found that doing so also caused severe back pain. (*Id*.). He neither cooked nor washed laundry. (Tr. 161).

Berry also complained of mental impairments, including depression and panic attacks. (Tr. 155). He reported that these conditions were worsening over time. (Tr. 158).

Berry alleged that his pain level sat around seven or eight out of ten daily despite the use of medication, and is never lower than six of ten. (Tr. 156). Cutting the grass worsened his pain, as did changing diapers, and bending over a counter. (Tr. 157).

Berry stated that he had "no hobbies," but occasionally visited the casino. (Tr. 163). He watched "a lot" of television. (Tr. 166). He sometimes used a computer, though he alleged that he "can't read it," and thus required assistance with computing. (Tr. 167). His personal use of a computer mostly consisted of playing slot machines, as that was "all [he] know[s] how to do." (*Id*.).

In terms of interpersonal relations, Berry asserted that he had one "good friend," and had familial relationships ranging from the positive to the negative. (Tr. 164-65). He described avoiding crowds when shopping, to the point of waiting for large masses of people to "clear out" so that he would be left "alone." (Tr. 166).

11

Berry stated that he sometimes required a reminder to take his medications. (Tr. 168). He slept around six and one half hours nightly, usually getting to bed around four in the morning, and napping two hours throughout the day. (Tr. 169). Berry asserted that he spent "a lot of time in [his] bedroom in [his] own bed," as this was the most comfortable position for him. (Tr. 170). He alleged that he spent "all day" in his room until six in the afternoon. (Tr. 170).

### d.    The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine Berry's ability to perform work. (Tr. 171). The ALJ asked several questions regarding Berry's past work, but these questions are not relevant as the ALJ found that Berry was unable to perform any past work, and thus based his unfavorable decision on Berry's ability to complete other work available in the national economy. (Tr. 172).

The ALJ asked the VE to assume a hypothetical individual with Berry's age, education, and work experience, and who could perform work as described in the ALJ's RFC assessment *supra*. (Tr. 173-75). The VE found that such a worker could perform work available in the national economy, including the positions of sandwich board carrier (200 jobs in Michigan, 13,000 jobs nationally), and greeter (300 jobs in Michigan, 25,000 nationally). (Tr. 176-77).

The ALJ then posed a second hypothetical, wherein the worker would be limited as in the first hypothetical, but with additional limitations to "lift, carry, push, pull up to 10

12

pounds occasionally [inaudible] frequently; sit for a total of six hours a day; stand and/or walk for a total of two hours a day." (Tr. 177). The VE found that a so-limited individual would be able to perform work as a surveillance system monitor, an unskilled sedentary position with 500 jobs in Michigan and 30,000 in the national economy. (Tr. 178).

In a third hypothetical, the ALJ added that the worker would be unable to "maintain regular attendance and be punctual within customary tolerances and could not perform activities within a schedule." (Tr. 178). The VE found that such a worker would be unable to perform any jobs available in substantial numbers in the national economy. (*Id.*).

### F.   Governing Law

In the Sixth Circuit, a prior decision by the Commissioner can preclude relitigation in subsequent cases.

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

SSR 98-4(6), 1998 WL 283902, at \*3 (acquiescing to *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997)). The regulations also explicitly invoke *res judicata*: An ALJ can dismiss a hearing where "res judicata applied in that we have a previous [final] determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957, 416.1457. Collateral estoppel is the branch of *res judicata* applied in this context. As the

13

Third Circuit explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d Cir. 1985); *see also Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (discussing the "collateral estoppel branch of res judicata" in social security cases). Claim preclusion prevents renewing a judgment on the same cause of action; issue preclusion, or collateral estoppel is less expansive: "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Purter*, 771 F.2d at 689 n.5.

The *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review."). The Commissioner's internal guide explains the different issues and factual findings precluded by *res judicata* under *Drummond*. *See Soc. Sec. Admin., Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-9 (Dec. 30, 1999). These include the RFC and various other findings along the sequential evaluation process, such as "whether a claimant's work activity constitutes substantial gainful activity," whether she has a severe impairment or combination of impairments, or whether she meets or equals a listing. *Id.*

Evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier

14

decision. *See Bailey ex rel. Bailey v. Astrue*, No, 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though the first ALJ did not make any findings concerning the latter period, her decision still applies to that period absent the requisite proof. Thus, as applied in this Circuit, the SSR 98-4(6) and *Drummond* essentially create a presumption that the facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" on the finding. *See Makinson v. Colvin*, No. 5: 12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) (adopting Report & Recommendation) ("[U]nder *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*.") (citing *Slick v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 U.S. Dist. LEXIS 3653, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009); *cf. Randolph v. Astrue*, 291 F. App'x 979, 981 (11th Cir. 2008) (characterizing the Sixth Circuit's rule as creating a presumption); *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988) ("The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove 'changed circumstances' indicating a greater disability." (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985))).

In *Drummond*, for example, the court held that the first ALJ's RFC applied to a subsequent period unless the circumstances had changed. 126 F.3d at 843; *see also Priest v. Soc. Sec. Admin.*, 3 F. App'x 275, 276 (6th Cir. 2001) (noting that in order to win benefits

15

for a period after a previous denial, the claimant "must demonstrate that her condition has so worsened in comparison to her condition [as of the previous denial] that she was unable to perform substantial gainful activity"); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993) (same). The Sixth Circuit made this clear in *Haun v. Commissioner of Social Security*, rejecting the argument that *Drummond* allowed a second ALJ to examine *de novo* the unadjudicated period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004).

To overcome the presumption that the claimant remains able to work in a subsequent period, the claimant must proffer new and material evidence that her health declined. The Sixth Circuit has consistently anchored the analysis on the comparison between "circumstances existing at the time of the prior decision and circumstances existing at the time of the review." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). In a case predating *Drummond*, the court explained. "[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey*, 987 F.2d at 1232-33. Later, it reiterated, "In order to be awarded benefits for her condition since [the previous denial], Priest must demonstrate that her condition has . . . worsened in comparison to her [previous] condition . . . ." *Priest*, 3 F. App'x at 276. The ALJ must scan the medical evidence "with an eye toward finding some change from the previous ALJ decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:1-cv-58, 2012 WL 6764068, at *5

16

(E.D. Tenn. Nov. 14, 2012), *Report & Recommendation adopted by* 2013 WL 53980, at *1 (Jan. 2, 2013). That is, the evidence must not only be new and material, but also must show deterioration. *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 U.S. Dist. LEXIS 115925, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 U.S. Dist. LEXIS 110609, 2011 WL 4502955, at *4 (Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a report met this test simply because it was not before the first ALJ. *See* 2011 WL 4502988 at *2, 8-9. These decisions make clear that the relevant change in circumstances is not a change in the availability of evidence but a change in Plaintiff's condition.

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and

17

physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's

impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Berry v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record

and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Berry v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough

to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a).

Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the

severity and persistence of the pain simply because they lack substantiating objective

evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming

evidence forces the ALJ to consider the following factors:

> (i)      [D]aily activities;
> (ii)     The location, duration, frequency, and intensity of . . . pain;
> (iii)    Precipitating and aggravating factors;
> (iv)     The type, dosage, effectiveness, and side effects of any
>          medication . . . taken to alleviate . . . pain or other symptoms;
> (v)      Treatment, other than medication, . . . received for relief of . . .
> pain;
> (vi)     Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027,

1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's

work history and the consistency of his or her subjective statements are also relevant. 20

C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the

groundwork for this, stating, "An individual shall not be considered to be under a disability

unless he [or she] furnishes such medical and other evidence of the existence thereof as the

Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5.

The RFC "is the most he [or she] can still do despite his [or her] limitations," and is

measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

A hypothetical question to the VE is valid if it includes all credible limitations developed

prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.      Analysis

The Court notes that Berry previously applied for benefits and was denied. (Tr. 183, 180-92). The ALJ in this case found that he was bound to accept the prior decision unless new and material evidence was presented**.** The ALJ here found new and material evidence of deterioration in Berry's condition, but nevertheless concluded that this deterioration was not sufficient to render Berry disabled. (Tr. 114). Since the parties did not argue their briefs under the *res judicata* standards, which are more difficult to overcome for the Plaintiff, the Court addresses the arguments as raised. However, it should be noted that if the district judge disagrees with the instant recommendation, the case may benefit from resubmitted briefs from the parties addressing the more difficult standards for proving disability under *res judicata*.

Berry argues that the ALJ erred in six ways, each of which should merit remand. (Doc. 13 at 2-16). These arguments will be addressed in turn.

### 1.      The ALJ Properly Analyzed Berry's Mental Health

Berry first argues that the ALJ improperly evaluated his mental health records. (Doc. 13 at 9-11). He initially argues that the ALJ "should have performed a residual functional capacity assessment to determine whether the Plaintiff is able to perform some

22

jobs in spite of the mental limitations, including all of the documented symptoms previously reported." (*Id*.). This complaint is frankly puzzling, as review of the transcript shows that the ALJ spent a large portion of the hearing discussing Berry's RFC with the VE, as detailed above. (Tr. at 173-75). Likewise, the bulk of the ALJ's decision is composed of a recitation of Berry's medical records and an explanation as to why those records justify the ALJ's RFC assessment. (Tr. 116-26). Insofar as Berry might be interpreted to argue that the ALJ erred by not obtaining a consultative examination, that argument is dealt with in section five, below.

Berry also argues that the ALJ "completely discounted an accepted evaluation method, known as the global assessment functioning rating, because it did not support his finding of not disabled." (Doc. 13 at 10). This assessment, like Berry's prior argument, bears little resemblance to the evidence at hand. In reality the ALJ gave several good reasons for discounting the value of global assessment functioning ("GAF") scores generally, including the fact that the scores are subjective and thus vary widely from expert to expert, because they reflect only a snapshot in time of a claimant's mental health, and because GAF scores have been abandoned by the most recent version of the Diagnostic and Statistical Manual of Mental Disorders. (Tr. 124).

The Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Kennedy v.*

*Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007) (citations omitted). Therefore, any decision not to rely on the GAF score is of little consequence and would not undermine a decision supported by substantial evidence. *See Oliver v. Comm'r of Soc. Sec.*, No. 09-2543, 2011 WL 924688, at *4 (6th Cir. Mar. 17, 2011) (upholding ALJ's decision not to rely on GAF score of 48 because it was inconsistent with other substantial evidence in the record and noting that the "GAF score is not particularly helpful by itself"); *Turcus v. Soc. Sec. Admin.*, 110 F. App'x 630, 632 (6th Cir. 2004) (upholding ALJ's reliance on doctor's opinion that plaintiff could perform simple and routine work despite GAF score of 35).

As applied to Berry's particular case, the ALJ noted that the GAF score of 50[1], as issued by one of Berry's physicians in August 2014, was inconsistent with the overall state of his mental health throughout his medical records. (Tr. 125). The ALJ properly noted that Berry lived a fairly active life, including taking care of his daughter, performing chores, shopping, visiting the casino, and running errands. (Tr. 116). Further, the ALJ noted that Berry asserted he sometimes went out to eat, got along with some members of his family well, and that Berry suffered no episodes of decompensation. (*Id.*). On the other hand, the ALJ also noted Berry's indifferent attitude towards some care providers, his diagnoses of bipolar disorder and generalized anxiety disorder, his inability to perform simple mathematical calculations, and his difficulty comprehending complex tasks. (Tr. 120, 123-

---

[1] A GAF score of 41 to 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

24). Berry does not point to any particular mental health medical record which the ALJ ignored, and review of the ALJ's decision demonstrates that his overview of Berry's mental health is fairly comprehensive.

In his reply brief, Berry makes specific note of certain medical records which indicate that:

> [H]is mental health conditions had gotten worse since he stopped working, that he does not get along with people other than his mother and brother, he was chased out of church when he was 16, he avoids people when out in public, he has issues with his memory, and due to sleep disturbance he sleeps for 2 hours during the day . . . . It was observed and opined by his psychiatrist that he was not able to cope with stress, religious beliefs, and frustration tolerance, had impaired remote memory, was easily distractible, and was impulsive.

(Doc. 15 at 2). Berry argues that those conditions "should have resulted in more limiting restrictions than were included in the ALJ's RFC." (*Id.*). He admits that "the Plaintiff's mental health doctor's records did not contain any restrictions," but argues that the ALJ was free to find that "those records . . . suggested more severe restrictions than those provided in the agency's consultative reports . . . ." (*Id.*). Berry gives no indication what additional restrictions might be necessary to accommodate his conditions, but merely mentions the possibility that the ALJ *could have* included more restrictive limitations in his RFC assessment. The ALJ included the following mental limitations in his RFC finding:

> He could understand, remember and carry out short, simple, repetitive instructions. He could sustain his attention/concentration for 2-hour periods at a time and for 8 hours in the workday on short, simple, repetitive

25

> instructions, and he could use judgment in making work decision related to short, simple repetitive instructions. He would require an occupation with set routine and procedures and few changes during the workday. He could not perform fast-paced production work. He could maintain regular attendance and be punctual within customary tolerances and could perform activities within a schedule.

(Tr. 117). These restrictions (and indeed they are rather restrictive) appear to fully accommodate Berry's credible mental health limitations, and Berry has provided no particularized argument to the contrary. Berry has not, for instance, demonstrated via cites to portions of the medical record why he would require a restriction of limited contact with the public. Instead, he leaves it to the Court to determine which further restrictions might be appropriate. Berry's underdeveloped argument should be found waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *see also Salazar v. Colvin*, No. CIV-15-1097-STE, 2016 WL 4031269, at *6 (W.D. Okla. July 26, 2016) ("Although he states that the RFC was not supported by the evidence in the record, he has not cited any portion of the record which he believes was not considered by the ALJ or would have supported more restrictive limitations. As a result, the Court concludes that Mr. Salazar has waived any argument regarding error in the RFC through a failure to develop his argument."). No error can be found here.

26

Berry also argues that the ALJ inconsistently gave lesser weight to Mr. Jeter's[2] opinion because it was a "snapshot in time," but gave great weight to a state agency psychologist, Dr. Jerry Csokasy, who "merely reviewed the Plaintiff's records but never evaluated the Plaintiff." (Doc. 13 at 10). Indeed, the ALJ gave lesser weight to Mr. Jeter's opinion insofar as that expert concluded that Berry would have "moderate difficulty in getting along with supervisors, work peers, and the public because the consultative examiner's opinion is an overestimation of the severity of the claimant's limitations, and was based only on a snapshot of the claimant's functioning." (Tr. 124). The ALJ found that "[t]he longitudinal evidence of record developed through the hearing level, the claimant's testimony, and function reports show that the claimant engaged in many activities and had only mild limitations with social functioning." (*Id*.). Berry does not specifically challenge this assessment, and indeed could not credibly do so. As noted, Berry engaged in a wide-ranging set of activities of daily living ("ADLs") in and out of the home, and testified that he had relatively minimal difficulty getting along with others. (Tr. 139, 165). He reported no issues getting along with his girlfriend and her children (Tr. 139), traveled outside of the home without issue and shopped in stores regularly (Tr. 357), hunted with friends (Tr. 359), played games at the casino (Tr. 163), reported having one "good friend" (Tr. 164), and got along with certain members of his family (Tr. 164-65). While he also reported

---

[2] The medical records indicate that the opinion referred to by the ALJ was in fact produced by John Jeter, MA, LLP, LMSW, under the direction of Dr. Hugh Bray. (Tr. 425). While the parties discuss this evidence under the name "Dr. Bray," the Court will use Mr. Jeter's name for clarity.

some fear of large crowds and sometimes getting annoyed with others (Tr. 166, 359), there is no evidence in the record that these alleged limitations impaired Berry's ability to perform chores, shop, meet with friends and family, enjoy his hobbies, or perform other ADLs.

The ALJ was thus not incorrect in finding that Berry was only mildly limited in his interactions with others. Furthermore, the ALJ did not engage in any inconsistency by giving lesser weight to Mr. Jeter, who evaluated Berry in person, than to Dr. Csokasy, who merely reviewed Berry's medical records. While Mr. Jeter likely obtained useful perspective on Berry's condition by examining him in the flesh, that perspective was of course tied to Berry's condition on the day of treatment. Dr. Csokasy, on the other hand, had the benefit of a complete medical file to review, and thus could provide insight on how Berry's condition changed over time. The ALJ reasonably concluded that Dr. Csokasy's opinion was more consistent with the totality of the evidence than the opinion drafted by non-physician Mr. Jeter. Specifically, Dr. Csokasy concluded that Berry had mild limitation in terms of his ADLs, social functioning, moderate difficulties with concentration, persistence, and pace, and no episodes of decompensation. (Tr. 210-11). Likewise, Dr. Csokasy found that Berry would have difficulty with completing complex tasks on a sustained basis, and would be able to perform simple and routine tasks on a sustained basis. (Tr. 210). Where Berry's mental health treatment records are scant, and Berry himself attested to completing a wide variety of daily activities inside and outside of

28

the home, by himself and with others, there is no reason to believe that Berry would require restrictions greater than those proposed by Dr. Csokasy. The ALJ also reasonably rejected Mr. Jeter's conclusion that Berry would have moderate difficulty working with supervisors, peers, and the public, because Berry's activities of daily living suggest that he is capable of getting along with others without significant limitation. (Tr. 124, 425). No error can be found here, either.

Finally, Berry asserts that the ALJ "did not address the need for extra time, rest periods, assistance with ADL's and the presence of good and bad days in his opinion." (Doc. 13 at 10). Mr. Jeter's opinion, drafted on January 15, 2014, includes the following words:

> ADL's: Fair to Poor; varies with pain, movement and motivation. Patient requires extra time and rest periods due to pain, movement, fatigue, motivation and depression. ADL's are assisted by fiancée. Light ADL's accomplished on days that pain, mood, and health conditions do not interfere.

(Tr. 425). Berry contends that these words represent Mr. Jeter's opinion on what accommodations Berry should be afforded given his condition. (Doc. 13 at 10; Doc. 15 at 4). In defense of this reading, Berry noted that above the quoted phrase is a line reading "Overall: The patient is sullen, angry, defensive, irritated, sarcastic and withdrawn. The patient presents with a depressed mood." (Tr. 425). The Commissioner argues that Mr. Jeter's "ADL's" or "activities of daily living" section reflects nothing more than a transcription of Berry's complaints, though she makes no argument in favor of this interpretation.

29

Berry's argument has some initial plausibility; Mr. Jeter's writing is indeed subject to at least two interpretations, as they bear no clear indication as to which portions are the expert's findings and which are mere transcriptions of Berry's complaints. Through careful reading, I find that the Commissioner's interpretation of these records is more sensible. First, Berry seems to be correct that Mr. Jeter's section beginning with the word "overall" is indeed a recitation of that expert's considered opinion. There, Mr. Jeter notes that the "patient is sullen, angry, defensive, irritated, sarcastic and withdrawn" (Tr. 425); these appear to be descriptions of how Berry interacted with the examiner rather than Berry's descriptions of his own feelings. By contrast, the words used in the "ADL's" section suggest that those limitations emanated from Berry directly. Mr. Jeter, for instance, would have no way of knowing that Berry's "ADL's [sic] are assisted by fiancée" (*Id.*) but for Berry telling him so. Likewise, the note that Berry's "[l]ight ADL's [sic] accomplished on days that pain, mood, and health conditions do not interfere" is not an expert's assessment of Berry's capacities, but rather is a self-report of how Berry spends his days. Read in this context, the other portions of the "ADL's" paragraph, including "[p]atient requires extra time and rest periods due to pain, movement, fatigue, motivation and depression," and "ADL's: Fair to Poor" appear more likely to be Berry's self-reported complaints. Because a physician's recording of a patient's self-reported complaints is not evidence, *see Alexander v. Comm'r of Soc. Sec.*, No. 13–CV–12434, 2014 WL 4678057, at *8 (E.D.

Mich. Sept. 18, 2014), the ALJ did not err by not including these limitations in his RFC assessment.

### 2.     The ALJ Properly Evaluated Berry's Ability to Ambulate

Berry next argues that the ALJ erroneously discounted some of his well-established ambulation limitations, including his use of a four-pronged cane, his history of falling, a recommendation to undergo surgery, and a note that Berry's "gait was slow with a slight limp noted." (Doc. 13 at 11-12) (Tr. 393, 502, and quoting Tr. 421).

The ALJ addressed Berry's ambulation issues, noting that he was prescribed a cane "based only on his reports of falling," but further noting that there were "no findings of decreased lower extremity strength," with "no objective evidence in his treatment records or longitudinal evidence of record to support these allegations. (Tr. 120).

Review of Berry's records demonstrate that in May or June of 2012 Dr. Mohamed Osman "recommend[ed] spine surgery" to Berry, though there is no evidence that Berry ever went through with that surgery. (Tr. 393). In January 2014 consultative examiner John Jeter found that Berry's "gait is slow, with a slight limp noted." (Tr. 421). Notably, Mr. Jeter is not a doctor of physical medicine, and indeed is not a doctor of any sort; he is a social worker under the supervision of Dr. Hugh Bray. (Tr. 425). On December 8, 2014, Berry was prescribed a quad cane by an unknown physician for "lumbar spondylosis with falling." (Tr. 502). Aside from these few, questionable bits of evidence, there is scant mention in the record of Berry's leg health and ability to ambulate.

31

If indeed Berry was suffering from such great leg weakness that he required surgery, walked with a limp, and required the use of a bulky four-pronged cane over an extended period of time, it would stand to reason that his testimony regarding his symptoms and activities of daily living would make some mention of the same. In reality, Berry described in his function report an active life including shopping, performing chores, driving, and hunting. (Tr. 354-58). He complained of back, neck, hand, and nerve ailments, but said nothing of his legs. (Tr. 354). Berry also noted use of an ankle brace, though that particular assistive device was not mentioned during his testimony at the hearing. (Tr. 360). Likewise, in his testimony before the ALJ Berry testified that he was able to use a weed whacker, could walk for two blocks without stopping, sometimes vacuemed with difficulty, and occasionally visited a casino. (Tr. 160, 163-64). While Berry complained of arm and leg pain resulting from a pinched nerve (Tr. 155), he had nothing to say about falling, and put little emphasis on walking difficulties.

Likewise, if Berry suffered from such severe leg impairments that it resulted in falling, use of a cumbersome four-pronged cane, and caused a limp, one would expect ailments sufficient to cause these symptoms to appear regularly in the medical record. Berry calls out no medical records demonstrating objective findings which could support these severe restrictions, and (beyond the three records under consideration) does not even cite medical records containing subjective complaints relating to his ambulation. It is indeed possible that Berry suffered from some brief bouts of difficulties ambulating which

32

elicited a recommendation of surgery from one physician, a prescription of a four-pronged cane from another, and a notation that Berry limped from non-physician Mr. Jeter. Yet the record simply does not support a finding that Berry required the use of a cane or any ambulation restrictions beyond those imposed by the ALJ in his RFC finding and related hypothetical. The ALJ did not err by declining to impose greater ambulation limitations because none are indicated by the record as a whole. No error can be found here.

Additionally, in the section dealing with ambulation restrictions, Berry attempts to slip in an additional argument relating to the ALJ's analysis of pain and medication. In full, Berry argues that:

> The Plaintiff respectfully argues that the ALJ failed to properly analyze the pain issues including but not limited to:
> 1. Failing to comply with SSR #96.7p in properly explaining how the pain standard was being applied to the facts and circumstances of the case; and,
> 2. Failing to properly analyze the side effects from the Plaintiff's medications on his ability to work as required. Plaintiff had provided testimony regarding his medication side effects that were not addressed in the decision.
> The Plaintiff submits that this matter should be remanded for further proceedings pursuant to sentence four and sentence six.

(Doc. 13 at 12). It is well established that a plaintiff may not raise an argument in the "most skeletal way," leaving it to the Court to put meat on the legal bones. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Berry's arguments regarding the method of evaluating pain under SSR 96-7p and evaluating medication side effects could hardly be raised in a more "skeletal" fashion. Berry has not even deigned to reference a particular

33

portion of the ALJ's decision, nor his own medical records, but rather merely gestures towards possible arguments that an attorney could theoretically raise. This is not sufficient to constitute an argument at all, and the Court ought not dignify this *ipse dixit* style of argumentation with extended analysis. Whatever cogent arguments Berry could have raised on this point have been waived by his failure to develop this claim in a more than skeletal manner. Nevertheless, the Court notes that the ALJ specifically addressed SSR 96-7p in his decision (Tr. 122), considered some of Berry's pain management techniques including pain relieving injections (*Id*.), and discussed Berry's alleged medication side effects (Tr. 123).

### 3.    Berry Has Not Demonstrated Any Bias on the Part of the ALJ

Berry next argues that ALJ Kramzyk is amongst the ALJs with the lowest rate of disability claim approvals nationwide, with an approval rate hovering around twenty percent, less than half the national average. (Doc. 13 at 13). Plaintiff suggests that Kramzyk engages in an "obvious pattern of denials," which "suggests that this particular judge selectively picks and chooses from evidence in the file in an attempt to rationalize a denial." (*Id*.). The Commissioner argues that Plaintiff has not provided any source for the alleged statistics, and that the burden of proving an accusation of bias rests with the claimant. (Doc. 14 at 20).

When considering a claim that an ALJ's decision is colored by bias, the Court must begin with the "presumption that policymakers with decisionmaking power exercise their

34

power with honesty and integrity." *Collier v. Comm'r of Soc. Sec.*, 108 F. App'x 358, 363–64 (6th Cir. 2004) (citing *Navistar Int'l. Transportation Corp. v. United States Environmental Protection Agency*, 941 F.2d 1339, 1360 (6th Cir. 1991)). "The burden of overcoming the presumption of impartiality 'rests on the party making the assertion [of bias],' and the presumption can be overcome only with convincing evidence that 'a risk of actual bias or prejudgment' is present." *Id.* (citing *Navistar*, 941 F.2d at 1360). That is to say, "any alleged prejudice on the part of the decisionmaker must be evident from the record and cannot be based on speculation or inference." *Id.*

Arguments which purport to demonstrate that an ALJ is biased through the use of statistics relating to their approval and denial rates are "inadequate to show bias" without additional evidence. *Perkins v. Astrue*, 648 F.3d 892, 903 (8th Cir. 2011); *see also Doan v. Astrue*, 04CV2309 DMS (RBB), 2010 WL 1031591, at *15 (S.D.Cal. March 19, 2010) *Johnson v. Comm'r of Soc. Sec.*, No. 08–4901, 2009 WL 4666933, at *4 (D.N.J. Dec. 3, 2009); *Smith v. Astrue*, No. H–07–2229, 2008 WL 4200694, at *5–6 (S.D. Tex. Sept. 9, 2008).

Regardless of whether ALJ Kramzyk tends to deny more cases than other administrative judges, the question before this Court is not whether the ALJ is fair as a general proposition, but whether his decision in this case is supported by substantial evidence. *See Sullivan*, 595 F. App'x at 506. Berry has not pointed to any statements by

ALJ Kramzyk in this matter which even smack of bias, he simply disagrees with the ALJ's decision and the ALJ's assessment of evidence in the record to support that conclusion.

Review of the ALJ's decision and the hearing transcript likewise reveals no biased statements, presumptions, hostility, or other grounds for finding bias. This falls far short of the standard for reversible bias displayed in other benefits cases. *See, e.g.*, *Fluker v. Comm'r of Soc. Sec.*, No. CIV.A. 12-10612, 2013 WL 1122876, at *10 (E.D. Mich. Feb. 11, 2013) (noting "racial undertones" in the ALJ's questions at the hearing, the ALJ's frequent and unnecessary interruptions of the claimant's testimony, and general hostility towards the claimant) report and recommendation adopted in part, No. 12-10612, 2013 WL 1122447 (E.D. Mich. Mar. 18, 2013). Insofar as Berry believes that ALJ Kramzyk is unfair as a general proposition, that issue might be better raised in a letter to the Commissioner directly. No cause for error can be found here.

### 4.    Berry Waived Any Argument Regarding the ALJ's Weighing of Treating Physicians' Opinions

Berry next argues, in a general fashion, that the ALJ did not properly evaluate the opinions of his treating physicians, and thus violated the rules set forth by SSR 96-2p and 20 C.F.R. § 416.927(d). (Doc. 14 at 13-14). He notes that the opinions of treating physicians must be evaluated in light the six factors listed in 20 C.F.R. 927(d) (and § 404.1527(c), as discussed *supra*), and alleged that the ALJ failed to perform this task, opting instead to grant greater weight to "the opinions of one-time Consultation Examiners

36

and/or agency doctors, despite the Administrative Record contradicting records from the Plaintiff's treating doctors for both physical and mental health issues." (Doc. 13 at 14).

Once again, rather than present an argument which applies fact to law, Berry merely gestures towards a potential argument that a diligent lawyer might make. He does not present any particular portions of the medical record which the ALJ overlooked, nor does he present a holistic analysis demonstrating that a particular treating physician deserved greater weight than he was accorded. Indeed, Berry does not even mention any particular treating physician by name, leaving it for the Court to scour the record for a potential opinion which one might argue the ALJ gave insufficient deference. Berry merely notes that the ALJ gave greater weight to certain (again, unnamed) consultative physicians than he gave to some (or perhaps all) of Berry's treating physicians. This argument should also be found waived. Nevertheless, the Court notes, as did the ALJ, that none of Berry's treating physician appear to have rendered an opinion about the sorts of activities he could perform given his ailments. (Tr. 123). Consequently, there was no treating physician opinion in the record for the ALJ to weigh. *See* 20 C.F.R. § 404.1527 ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.").

### 5.   The ALJ Did Not Err by Declining to Order a Consultative Examination

Berry also argues that, pursuant to the ALJ's duty to develop the record, he ought to have "obtain[ed] a Consultation Examination with an orthopedic specialist" in order to further develop Berry's asserted limitations relating to spinal disorders, carpal tunnel syndrome, neuropathy, arthritis, obesity, hypertension, hyperlipidemia, and headaches. (Doc. 13 at 14-15). Berry is correct that an ALJ may order a consultative examination to be performed at the Commissioner's expense. *See* 20. C.F.R. § 404.1517 ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests.").

Berry cites to several Second Circuit cases from the late 1990s in support of his claim that an ALJ is sometimes required to order a consultative examination. (Doc. 13 at 15). That Berry's strongest support in favor of this argument is outdated, out of circuit case law is the first indication that his argument lacks plausibility. Moreover, the cases he cites addressed factual circumstances very different from this case. In *Sanders v. Chater*, 920 F. Supp. 293, 293 (D. Conn. 1996), the records of a treating physician could not be obtained, and the claimant's condition could not be assessed without use of a consultative examiner. Likewise, in *Hughes v. Apfel*, 992 F. Supp. 243, 248 (W.D.N.Y. 1997) the court found that use of a consultative examiner was necessary for the ALJ to render a decision, and thus the failure to acquire such an examination was error. In particular, that court noted the ALJ himself found that consultation of a gastrointestinal specialist was necessary, but then

38

failed to obtain such an examination. *Id.* Finally, in *Schaffer v. Apfel*, 992 F. Supp. 233, 237 (W.D.N.Y. 1997), the court found that a claimant suffering from chronic fatigue syndrome met the standard for a consultative examination, evidently due to the "lack of a clinically accepted methodology for diagnosing [chronic fatigue syndrome]" and the claimant's difficulty in demonstrating the same. Berry has not established that his case bears any resemblance to any of these three cases. He has not alleged that a physician's records, crucial to the outcome of this case, remain unavailable despite his attempt to acquire them. He has not argued that the ALJ found a consultative examination was necessary, but failed to acquire one. Likewise, he has not argued that he suffers from a condition for which there is no clinically accepted methodology for diagnosis, and that use of a consultative examiner is necessary to establish the existence of that condition.

Berry also cites to a 2001 Sixth Circuit opinion wherein that court found that an ALJ was *not* required to order a consultative examination, but rather merely had discretion to do so if necessary. *See Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001). While the ALJ must make a full inquiry of the evidence, "'full inquiry' does not require a consultative examination at government expense unless the record establishes that such an examination is necessary to enable the administrative law judge to make the disability decision." *See Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)). In this case, Berry has not established that any purpose would be served by the ALJ ordering Berry to undergo a

39

consultative examination with an orthopedic specialist. Berry merely disagrees with the ALJ's interpretation of the medical evidence he provided. This is not a sufficient reason to order a consultative examination, thus the ALJ did not err by declining to order one.

### 6. The ALJ's Decision at Step Five is Supported by Substantial Evidence

Finally, Berry argues that the ALJ's decision is flawed because his analysis at Step Five is not well supported. (Doc. 13 at 16). Berry asserts that he has "established a *prima facie* showing of inability to perform his former occupations and all other work, based upon the SSA Exhibits and his testimony. Once a Claimant makes such a showing, the burden shifts to the SSA at Step #5 to provide that there are jobs existing in significant numbers." (*Id.*).

At the outset, the Court notes that Berry's statement of the legal standard at Step Five is incorrect. At Step Four, the claimant bears the burden of demonstrating (via *prima facie* evidence) that he or she cannot perform his or her past relevant work; at Step Five, the burden shifts to the Commissioner to establish that the claimant can nevertheless perform work which exists in substantial numbers in the national economy. *See Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005).

In any case, Berry's argument is fatally underdeveloped, and should also be found waived. Berry's argument stops where it ought to begin. He correctly notes that the Commissioner bears the burden at Step Five of establishing that jobs exist in substantial numbers in the national economy which the claimant can perform despite his or her

40

impairments, yet he does not specify why the Commissioner failed to meet that burden. (Doc. 13 at 16).

Berry's true issue with the ALJ's Step Five finding appears to be the frequently raised claim that the ALJ's hypothetical questions to the VE do not accurately represent the ailments, symptoms, and limitations he experienced, thus the VE's answers did not produce substantial evidence upon which the ALJ could rely. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) ("In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments."). Berry provides no indication of why he believes the ALJ's questions to the VE did not accurately represent the limitations he experiences, and he is not entitled to rely upon the Court to develop this argument on his behalf.

**7.    Remand Pursuant to Sentence Six is Not Appropriate**

Berry requests that the Court remand his case pursuant to Sentence Six of 42 U.S.C. § 405(g). (Doc. 13 at 17). Remand pursuant to Sentence Six is reserved for occasions where "new evidence" crops up, which stands to change the outcome of the Commissioner's decision. In order to qualify for a Sentence Six remand, "it must be shown (i) that the evidence at issue is both 'new' and 'material,' and (ii) that there is 'good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Hollon ex rel.*

41

*Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006) (quoting 42 U.S.C. §

405(g)). Berry has not identified *any* new evidence in this case which could merit remand

under Sentence Six, and has made no effort to meet the criteria for remand under 42 U.S.C.

§ 405(g). Consequently, remand under Sentence Six is inappropriate, and should be denied.

In sum, Berry's assertions of error are either so skeletally presented that they merit

waiver, or fail on the merits. The ALJ's decision is supported by substantial evidence, and

should be affirmed.

### H.     Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Berry's Motion for

Summary Judgment (Doc. 13) be **DENIED**, the Commissioner's Motion (Doc. 14) be

**GRANTED**, and that this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14

days after being served with a copy of the recommended disposition, a party may serve and

file specific written objections to the proposed findings and recommendations. A party may

respond to another party's objections within 14 days after being served with a copy." Fed.

R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections

constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct.

466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505

(6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are

advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Berry v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: December 8, 2016                           S/ PATRICIA T. MORRIS
                                                 Patricia T. Morris
                                                 United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.


Date: December 8, 2016                           By s/Kristen Castaneda
                                                 Case Manager

43